# CASE/CITATION AVAILABLE IN WESTLAW ONLY
# Lester v. Trans World Airlines
# 1997 WL 417814



Not Reported in F.Supp. Page 1
Not Reported in F.Supp., 1997 WL 417814 (N.D.Ill.), 10 NDLR P 226
**(Cite as: Not Reported in F.Supp.)**

Lester v. Trans World Airlines, Inc.
N.D.Ill.,1997.

United States District Court, N.D. Illinois.
Anytra C. LESTER, Plaintiff,
v.
TRANS WORLD AIRLINES, INC., Defendant.
**No. 95 C 2349.**

July 23, 1997.

*MEMORANDUM OPINION AND ORDER*

MAROVICH
***1** Plaintiff Anytra C. Lester ("Lester") filed this action against Defendant Trans World Airlines, Inc. ("TWA") alleging violations of the Americans With Disabilities Act (the "ADA"), 42 U.S.C. § 12101*et seq.*, and intentional infliction of emotional distress arising out of Lester's infection with tuberculosis and TWA's decision to terminate her employment on February 3, 1994. TWA now moves for summary judgment with respect to both of Lester's claims. For the following reasons, the Court grants TWA's motion.

*BACKGROUND*

Unless otherwise noted, the following facts are undisputed. TWA is an international airline operating a reservations office in Chicago, Illinois. TWA hired Lester as a Reservation Sales Agent ("RSA") in its Chicago office in May 1990.

Lester's duties as a RSA included making and receiving telephone calls in order to sell TWA as a preferred carrier, booking airline reservations, selling telemail tickets and providing general assistance to passengers over the telephone. TWA's General Rules of Conduct advised all RSAs-including Lester-that they also "have an obligation to avoid tardiness, absence or departure from work early without the permission of their supervisors and [to] observe time limitations on rest and meal periods." Lester acknowledges being aware of TWA's policy, as well as its admonition that "neglect of duty ... will not be tolerated."

Over the first six months of Lester's employment, she was absent on two occasions for various illnesses including the flu and a stomach problem. Lynn Smith ("Smith"), Lester's supervisor, discussed these two absences with her and advised Lester to watch her attendance. Within a week of this discussion, however, Lester missed four more days of work with another stomach ailment. Smith again spoke with Lester about problems with her attendance record and wrote in Lester's performance review that "[Lester] must monitor attendance and not enter into attendance jeopardy."

Despite these warnings, Lester's attendance continued to worsen. Over the course of the next year, Lester was absent from work on nine separate occasions for various medical problems. In January 1992, Lester's new supervisor, George Cook ("Cook"), held an "attendance deficiency review meeting" with her to discuss her haphazard attendance record. At the conclusion of this meeting, Cook issued an "Attendance Deficiencies First Notice" or an "A letter" to Lester. In part, this letter provided:
During our discussion we reviewed your responsibility to TWA and to your coworkers. This letter will serve as your FIRST FORMAL WRITTEN NOTICE of the need for you to correct your attendance performance.
If I or Special Services can be of assistance in helping you to correct this situation, we encourage you to avail yourself of these resources.

Over the next seven months, Lester had 17 more absences for different illnesses including back pain and stomach problems. These absences prompted a performance review from Cook stating that "[Lester's] overall evaluation has decreased six percent from last year due primarily to her attendance...." Shortly thereafter, Cook issued a letter scheduling an attendance hearing to consider Lester's "excessive absenteeism during the period from August 20, 1990 through August 20, 1992." [FN1]

***2** At Lester's attendance hearing in August 1992, the Manager of Area Reservation Sales, Mary Jo Larsen ("Larsen"), explained the procedure of the hearing

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 2
Not Reported in F.Supp., 1997 WL 417814 (N.D.Ill.), 10 NDLR P 226
**(Cite as: Not Reported in F.Supp.)**

and the reasons for the hearing to Lester and her IAM representative.[FN2] Specifically, Lester was informed that if her attendance problem was not corrected, she could be terminated. Lester did not dispute any of the absences reflected on her attendance record. After the attendance hearing, Lester received an "Attendance Deficiencies-Second Notice" or "B letter." This letter was substantially the same as the "A letter" Lester had previously received. However, in addition to stating that the letter was Lester's "SECOND FORMAL WRITTEN NOTICE," it also advised:

Failure to correct your performance in this area could eventually lead to your discharge from the employ of Trans World Airlines, Inc.

During the remainder of 1992, from August through December, Lester had another 12 absences. Most of Lester's absences appeared to be the result of coughing and pneumonia. After returning to work for several weeks, Lester was absent from work for another four days due to what she reported as bronchitis. Shortly thereafter, on January 20, 1993, Lester was diagnosed with active tuberculosis and was admitted to the hospital.

Several days after Lester was admitted to the hospital, she called to advise Cook that she would be off work for an extended period of time because of her tuberculosis. Cook suggested that Lester complete a medical leave of absence form because she had already exhausted her sick leave time. On January 23, 1993, Lester submitted her initial request for a medical leave of absence. TWA granted Lester a medical leave of absence until February 15, 1993. Lester was also granted two extensions of her leave of absence until March 30, 1993. [FN3]

On March 30, 1993, Lester's doctor authorized her to return to work at TWA without restrictions. Lester had no absences for the first month of her return. During May and June 1993, however, Lester was absent from work for another five days with stomach problems. This absence precipitated a letter from TWA scheduling a "Final Notice" or "C letter" attendance hearing for June 29, 1993. The letter explained that Lester had again been charged with "excessive absenteeism from June 21, 1991 through June 21 1993."

At her June 1993 attendance hearing, Lester informed her supervisors that her most recent absences were due to the side effects of the medication she was taking for her tuberculosis. Lester told her supervisors that while she could not anticipate when she would be ill, her health was improving. Lester's supervisors asked if they could speak with her physician, Dr. Greene, about her condition. Lester agreed and gave them Dr. Greene's telephone number. During a telephone conversation with Dr. Greene, he advised Lester's supervisors that she was involved in an aggressive course of therapy and that her prognosis was good.

***3** In response to information concerning Lester's condition, her supervisors decided not to issue a "Final Notice" or "C letter" after the June 1993 attendance hearing. This was the first time that Lester's supervisors had ever deferred issuing a letter after an attendance hearing and Lester understood that this was an exception to the TWA attendance policy. Apart from informing her supervisors about her medical condition, Lester does not contend that she suggested any specific accommodations that could improve her attendance.

Less than three weeks after her June attendance hearing, Lester was absent for three more days due to illness. Lester received another letter informing her that she was being charged with excessive absenteeism and scheduling another "Final Notice" or "C letter" attendance hearing for August 3, 1993. At this hearing, Lester was again informed of the attendance hearing procedures and advised that unless her attendance problem was corrected, she would be terminated. Lester's supervisors issued an "Attendance Deficiencies-Final Notice" to her after the hearing. In addition to informing Lester that this was her third and final notice, the letter provided in part:

We have been most patient in giving you ample opportunity to correct your attendance deficiencies and demonstrate that you can be regularly counted upon to perform your duties ...

Unless there is an immediate and lasting correction made in your attendance record, you will be subject to discharge.

If I or Special Health Services can be of assistance in helping you to correct this situation, we encourage you to avail yourself of these resources.[FN4]

Lester wrote a letter in response to TWA's disciplinary action requesting that consideration be

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 3
Not Reported in F.Supp., 1997 WL 417814 (N.D.Ill.), 10 NDLR P 226
**(Cite as: Not Reported in F.Supp.)**

given to the side effects of her tuberculosis medication. In her deposition, Lester explained that the purpose of her letter was to encourage TWA to be more "flexible" in the application of its Attendance Control Program. Lester also confirmed that "flexibility" for her attendance problem was the only accommodation she had ever requested from TWA and that no other accommodation was needed.[FN5]

After two more absences due to illness during August, Lester completed her course of treatment for tuberculosis on September 16, 1993. Lester testified that by that time she no longer suffered from any side effects of the tuberculosis medication and that she was not experiencing any other health problems. Nevertheless, Lester's absences continued. From the middle of November until the middle of December, Lester was absent four days and late on another for health reasons.

Lester was again warned by a TWA supervisor that she was concerned that Lester would be terminated due to her attendance record. This supervisor suggested that Lester consider taking another medical leave of absence so that she could resolve any health problems and improve her attendance. Her supervisor went so far as to give Lester a partially completed medical leave of absence form and advised her to have her doctor fill it out. Lester refused to take a medical leave because she claimed that she "wasn't sick," and that she could not afford to take another medical leave of absence.

***4** TWA's patience finally ran out in January 1994, when Lester was absent for another five days due to an illness. By this time Lester had the worst attendance record in the Chicago reservations office. Accordingly, Lester received a letter from TWA on January 25, 1994, advising her that a discharge hearing had been scheduled to consider her excessive absenteeism.

Lester's discharge hearing took place on January 31, 1993. Lester chose to represent herself at the hearing and specifically requested that her IAM representative refrain from speaking on her behalf. Lester did not dispute any of the absences reflected on her record. Instead, she read a prepared statement explaining that her absences had been caused by her tuberculosis and asking TWA to make "an exception" for her attendance problems. Lester's statement also blamed TWA for her infection with tuberculosis and asserted that her absences could have been avoided if TWA had not been "negligent" in failing to inform her of another TWA employee who had also contracted tuberculosis. Lester was advised that TWA would make its decision within three days of the close of the hearing.

On February 3, 1994, Lester received a letter informing her that she had been terminated due to excessive absenteeism. The letter explained:

In view of your failure to correct the [attendance] problem after counseling and repeated hearings, I can only conclude that an additional warning or discipline at this point would be to no avail. Therefore, it is my decision that you will be discharged from the services of Trans World Airlines, Inc. effective at the end of your shift on February 3, 1994.

The letter made no reference to Lester's claim at the discharge hearing that TWA was somehow responsible for her infection with tuberculosis. Lester chose not to file a grievance under the TWA-IAM collective bargaining agreement regarding her termination.

Lester's original contention of "negligence" against TWA for her infection with tuberculosis ultimately matured into her claim of intentional infliction of emotional distress presently before the Court. Lester maintains that TWA intentionally inflicted emotional distress on her by failing to adequately inform her that another TWA employee had been diagnosed with tuberculosis.

In early-to-mid August 1992-approximately six months before Lester was diagnosed with tuberculosis-a RSA in TWA's Chicago office had been diagnosed with tuberculosis. TWA immediately reported this diagnosis to the Chicago Board of Health. The Board of Health sent TWA information to post on bulletin boards in its Chicago reservations office. On August 17, 1992, TWA posted an informational memorandum on all three bulletin boards in its Chicago reservations office. In addition to informing TWA employees that a RSA had been hospitalized for tuberculosis, the memorandum explained that tuberculosis was a potentially infectious disease and provided a list of locations where employees could get tested for the disease. The Chicago Board of Health advised TWA that it was

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 4
Not Reported in F.Supp., 1997 WL 417814 (N.D.Ill.), 10 NDLR P 226
**(Cite as: Not Reported in F.Supp.)**

not necessary to take any further action.

***5** Upon learning that Lester had been diagnosed with tuberculosis, TWA again contacted the Chicago Board of Health. This time the Board of Health conducted an inspection of the premises and identified a group of employees for required tuberculosis testing. TWA sent a memorandum to all reservation personnel advising them of the Board of Health's inspection and decision to test a selected group of personnel. Additionally, TWA sent letters to all employees who were not selected for testing to inform them that they could go to one of a number of listed facilities for testing if they so chose.[FN6]

*DISCUSSION*

A. *Standards for Summary Judgment*

Summary judgement is appropriate where the pleadings, answers to interrogatories, admissions, affidavits, and other materials show that there is "no genuine issue as to any material fact," and the moving party is entitled to judgement as a matter of law. Fed.R.Civ.P. 56(c). Only genuine disputes over "material facts" can prevent a grant of summary judgement. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those that might affect the outcome of the suit under governing law. *Id.* A "genuine issue" exists if there is "sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Id.* at 249. When considering a motion for summary judgement, the Court must view the facts, and all the inferences drawn from those facts, in the light most favorable to the non-moving party. *Griffin v. Thomas*, 929 F.2d 1210, 1212 (7th Cir.1991); *Roman v. U.S. Postal Service*, 821 F.2d 382, 385 (7th Cir.1987).

B. *Lester's ADA Claim*

Lester's principal claim is that she was discriminated against in violation of the ADA on the basis of what she contends is a disability. The ADA prohibits employers from discriminating against qualified individuals with a disability because of the disability of such individual with respect to job application, hiring, advancement, discharge, and other terms, conditions, and privileges of employment. 42 U.S.C. § 12112(a) (1995). The prohibition extends not only to the denial of employment opportunities based on vocationally irrelevant disabilities, but extends to discrimination based on disabilities that impair the individual's ability to perform her job. *Vande Zande v. State of Wis. Dep't of Admin.*, 44 F.3d 538, 541 (7th Cir.1995). Thus, the ADA defines discrimination as including an employer's "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such [employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such [employer]...." 42 U.S.C. § 12112(b)(5)(A).

Congress enacted the ADA to "level the playing field" for disabled people. "The ADA does not, however, erect an impenetrable barrier around the disabled employee, preventing the employer from taking any employment actions vis-a-vis the employee." *Seifken v. Village of Arlington Heights*, 65 F.3d 664, 666 (7th Cir.1995). To succeed, a plaintiff must show that: 1) she was or is disabled; 2) defendant was aware of her disability; and 3) she was an otherwise qualified individual for her job. *Bultemeyer v. Fort Wayne Community Sch.*, 100 F.3d 1281, 1284 (7th Cir.1996).

***6** The threshold determination is whether Lester can establish that she is "disabled" within the meaning of the ADA. *Hamm v. Runyon*, 51 F.3d 721, 724 (7th Cir.1995). An individual is "disabled" if she has: 1) a physical or mental impairment which substantially limits one or more of the major life activities; 2) a record of such impairment; or 3) if she is regarded as having such an impairment. 29 U.S.C. § 706(8)(B); 29 C.F.R. § 1613.702(a); 42 U.S.C. § 12102(2); 29 C.F.R. § 630.2(g); *Roth v. Lutheran Gen. Hosp.*, 57 F.3d 1446, 1454 (7th Cir.1995). Not every impairment that affects an individual's major life activities is a "substantially limiting" impairment, however. *Roth*, 57 F.3d at 1454.[FN7] The burden is on the plaintiff to establish that she is "disabled." *Hamm*, 51 F.3d at 724.

Lester contends that her tuberculosis infection was a substantially limiting impairment that qualified her for protection under the ADA. Lester points out that she was unable to breath without coughing, she was bedridden and hospitalized for several weeks and that she endured nine months of drug therapy for the treatment of her tuberculosis. Lester also has

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 417814 (N.D.Ill.), 10 NDLR P 226
**(Cite as: Not Reported in F.Supp.)**

Page 5

submitted affidavits from her doctors suggesting that although she was not diagnosed with tuberculosis until January 20, 1993, she had active tuberculosis for some time prior to November 1992. These same doctors also have opined that some of the effects of Lester's tuberculosis infection-and the drug therapy used to treat her infection-may have lasted through the end of 1993.[FN8] Even when Lester's tuberculosis is viewed in the light most favorable to her-as this Court must do on a motion for summary judgment-it was too temporary a condition to be considered a disability under the ADA.

"Under the ADA, '[i]ntermittent, episodic impairments are not disabilities.' " *Hamm,* 51 F.3d at 725 (citing *Van Zande,* 44 F.3d at 544). Accordingly, this Court has recognized that the ADA does not apply to "temporary, non-chronic impairments of short duration." *Gonzalez v. Perfect Carton Corp.,* 1996 WL 89058, at *2 (ND.Ill.1996); *see also Blue v. R.R. Donnelley & Sons, Inc.,* 1996 WL 613161 (N.D.Ill.1996), *rev'd on other grounds,* 114 F.3d 1191 (1997), (2 1/2 year back injury was temporary and ADA did not apply); *McDonald v. Commonwealth of Pennsylvania, Dept. of Public Welfare, Polk Ctr.,* 62 F.3d 92, 94 (3d Cir.1995) (ADA does not apply to "transient, nonpermanent condition"). Although neither party disputes that Lester's active tuberculosis infection was "substantially limiting" during the time when she was hospitalized and bedridden, the critical question before the Court is the duration of her disease. On this issue, Lester's physician, Dr. Greene, concedes that although tuberculosis can be a "chronic disease" if not treated, "[i]t is a curable disease with drug therapy." Moreover, Lester acknowledges that after she finished the drug therapy, she has suffered no physical impairments as a result of her infection with tuberculosis[FN9] or the medication she took to combat the infection.[FN10] Thus, plaintiff's own evidence supports the fact that her infection with tuberculosis was temporary.

***7** While conceding that the determination of disability must be made on a case-by-case basis, plaintiff argues that tuberculosis is viewed as a disability by the EEOC in its compliance manual. The *EEOC Compliance Manual,* however, states that tuberculosis may be substantially limiting when it is: 1) active; 2) has a high likelihood of recurrence in substantially limiting forms; or 3) requires substantial limitation of major life activity to prevent or lessen the severity of recurrence. *See EEOC Compliance Manual* § 902.4(d). Lester has presented no evidence that her tuberculosis is still active, that there is a high likelihood of it recurring in a substantially limiting form, or that a substantial limitation on her major life activities is required to prevent or lessen the severity of its recurrence. Therefore, instead of supporting Lester's position, the EEOC guidelines merely confirm that her condition does not constitute a disability.[FN11]

Finally, Lester urges this Court to consider her pre-existing condition of Crohn's disease which she was diagnosed with as a child. Lester now claims-in an affidavit filed with her brief-that many of her absences while she was employed at TWA were due to symptoms of Crohn's disease. She also claims that her "disability" should be considered as both tuberculosis and a combination of tuberculosis and Crohn's disease. After reviewing Lester's Complaint, her EEOC charge and her EEOC complaint, this Court is unable to find any mention of Lester's ongoing symptoms of Crohn's disease. Moreover, Lester testified in her deposition:

Q: Do you continue to have symptoms of Crohn's disease today?
A: No.
Q: When was the last time you suffered any symptoms of Crohn's?
A: '86, '87.

Lester's testimony is compounded by a "clarification" of the record made by her attorney during the deposition. Lester's attorney attempted to correct a question of opposing counsel about her client's Crohn's symptoms by stressing, "[Lester] said she no longer suffers any of those symptoms." This Court is troubled to see Lester's current affidavit where she now claims-contrary to her earlier sworn deposition testimony-that symptoms of Crohn's were responsible for her absences in 1991 and 1992. Accordingly, the Court will disregard those sections of Lester's affidavit. *See Russell v. Acme-Evans Co.,* 51 F.3d 64, 67-68 (7th Cir.1995) ("Where deposition and affidavit are in conflict, the affidavit is to be disregarded ...").

Ultimately, the Court finds insufficient evidence to conclude that a material issue of fact exists as to either Lester's supposed disability with Crohn's symptoms or her alleged disability with tuberculosis.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 6
Not Reported in F.Supp., 1997 WL 417814 (N.D.Ill.), 10 NDLR P 226
**(Cite as: Not Reported in F.Supp.)**

At most, the record indicates that Lester suffered from symptoms of tuberculosis temporarily. Thus, Lester is not entitled to relief under the ADA based upon her claim of disability discrimination.

Even assuming, arguendo, that Lester established her "disabled" status under the ADA, she has been unable to establish the final prong of her claim, that she was an "otherwise qualified individual" for the job of Reservation Sales Agent. Because the ADA prohibits discrimination against only "qualified individual[s] with a disability," Lester has the burden of proving that she was a "qualified individual." *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 563 (7th Cir.1996). Specifically, Lester must prove that she satisfies the prerequisites for the position and that she could perform the essential functions of her position either with or without reasonable accommodation. 29 C.F.R. app. § 1630.2(m); *Bombard*, 92 F.3d at 563;*Bultemeyer*, 100 F.2d at 1284.

***8** The uncontested facts establish that Lester was absent from work for over 39 days in the two and one-half years before she was diagnosed with tuberculosis-before TWA was aware of her illness. Lester was also onto the third stage of disciplinary proceedings at TWA as a result of her excessive absenteeism five months before TWA became aware of her infection. Moreover, even after Lester concluded her drug treatment for tuberculosis, her absenteeism continued virtually unabated. When Lester's illness is viewed in the light most favorable to her, this Court cannot conclude that she could perform the essential functions of her position-namely showing up for work.

Lester has also been unable to demonstrate that she ever suggested a reasonable accommodation to TWA which would have solved her attendance problem apart from being more "flexible"-i.e., allowing her to come and go to work as she pleased.[FN12] *Beck v. University of Wisconsin*, 75 F.3d 1130, 1137 (7th Cir.1996) ("An accommodation is something concrete-some specific action required of the employer."). Lester is not asking for an accommodation; she is not asking TWA to change anything. She wants another opportunity to improve her attendance. *See* *Seifken*, 65 F.3d at 665 (ADA does not require an employer to provide an employee with another chance).

While an employee must communicate the accommodation that she requires, "the employer has some responsibility in determining the necessary accommodation." *Beck*, 75 F.3d at 1137. Here, however, TWA clearly met its responsibility when it permitted Lester to take a two and one-half month leave of absence, deferred giving Lester her fourth progressive step of discipline under the TWA attendance program, excused her productivity requirement when she experienced complications from her medication, and offered her another medical leave of absence, which she rejected. Lester has failed to produce sufficient evidence to establish a genuine issue of material fact as to her ability to perform the essential functions of her job with reasonable accommodation. Accordingly, summary judgment will be entered in favor of TWA as to Lester's ADA claim.

C. *Lester's Intentional Infliction of Emotional Distress Claim*

Lester maintains that it was both "outrageous and inhumane" not to ensure that she was notified that another TWA employee had been diagnosed with tuberculosis. She asserts that TWA's failure to inform her of her co-worker's diagnosis was particularly extreme and outrageous given the fact that TWA had been "put on notice" that Lester herself had exhibited symptoms of tuberculosis.

To establish a claim for intentional infliction of emotional distress under Illinois law, Lester must prove: "1) that [TWA's] conduct was extreme and outrageous; 2) that [TWA] knew that there was a high probability that [its] conduct would cause severe emotional distress; and 3) that the conduct in fact caused severe emotional distress." *Kolegas v. Heftel Broadcasting Corp.*, 154 Ill.2d 1, 20, 607 N.E.2d 201, 211 (1992).

***9** The undisputed facts in this case demonstrate that TWA responded appropriately and responsibly to the report that one of its employees had been diagnosed with tuberculosis. TWA immediately advised the Chicago Board of Health when it learned of the infected employee, and TWA followed all the recommendations of the Board of Health once the incident had been reported. The evidence also establishes that TWA posted an informational

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 7
Not Reported in F.Supp., 1997 WL 417814 (N.D.Ill.), 10 NDLR P 226
**(Cite as: Not Reported in F.Supp.)**

memorandum to its employees on all three bulletin boards at its Chicago reservation office.

Lester responds that she did not see this posting and that she never heard anyone talking about the incident. Thus, Lester would require that TWA give her actual personal notice of this case of tuberculosis. Lester would also require TWA to have diagnosed her reported symptoms of tuberculosis despite the fact that her own doctor was unable to do so. While TWA's failure to live up to Lester's expectations might prove disappointing to her, it certainly does not rise to the level of extreme and outrageous conduct. Summary judgment in favor of TWA on Lester's claim of intentional infliction of emotional distress is therefore granted.

*CONCLUSION*

For the reasons set forth above, TWA's motion for summary judgment is granted in its entirety.

FN1. The attendance hearing is held in accordance with the provisions of a collective bargaining agreement, applicable to all RSAs, entered into by TWA with the International Association of Machinists and Aerospace Works ("IAM"). The TWA-IAM agreement provides that TWA has the right to enforce its "Attendance Control Program."

FN2. An IAM representative accompanied Lester to each of her subsequent attendance hearings.

FN3. Lester was paid 55% of her regular salary while out on her medical leave of absence.

FN4. Lester asserts that there was "no indication" that Special Health Services could do anything for her as it was a referral program to counselors or health care professionals generally used for drug and alcohol treatment. Nevertheless, there is no evidence that Lester ever investigated what type of assistance was actually available from Special Health Services.

FN5. On August 30, 1993, Lester made a specific request that her productivity requirement be excused for the day because of "complications of [her] TB medications." This request for a specific accommodation was granted by TWA.

FN6. The Board of Health eventually agreed to test any employee who had not been tested for tuberculosis and wished to be tested. This testing was facilitated by the reservation office at TWA.

FN7. "Major life activities" are defined as "functions, such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. §§ 1613.702(c), 1630.2(i); *Hamm*, 5 F.3d at 724.

FN8. This Court has grave doubts as to whether Lester's tuberculosis can be characterized as a "substantially limiting" impairment at any time after March 30, 1992, when she was authorized by her doctor to return to work. These doubts are compounded by her doctor's opinion that a medical leave of absence was "not [ ] warranted" by Lester's condition in late 1993.

FN9. Lester contends that her lungs have been permanently damaged, making her unable to run due to shortness of breath. Nevertheless, Lester herself does not consider this to be a "physical impairment," and the Court finds nothing in the record to suggest that her "major life functions" have been substantially limited due to her weakened lungs.

FN10. Because of the temporary nature of Lester's tuberculosis and drug therapy, this Court declines to address the question of whether the side effects of Lester's medication can or should be considered part of her alleged disability.

FN11. Lester cites to *School Board of Nassau County v. Arline*, 480 U.S. 273 (1987), to establish that tuberculosis can be

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 8
Not Reported in F.Supp., 1997 WL 417814 (N.D.Ill.), 10 NDLR P 226
**(Cite as: Not Reported in F.Supp.)**

a disability under the ADA. In *Arline*, the plaintiff was a school teacher who had been dismissed from her job, not because of her diminished physical capabilities, but because of the perceived "threat that her relapses of tuberculosis posed to the health of others." *Arline*, 480 U.S. at 281. Unlike the plaintiff in *Arline*, Lester does not contend that she was terminated because of a perception that she was contagious or a threat to others. She maintains that she was terminated due to the physical impairments of her condition.

FN12. Lester's brief indicates that what she meant by "flexibility" was that she could have been given a shift later in the day. The record, however, is devoid of any mention of Lester requesting a different shift.

N.D.Ill.,1997.
Lester v. Trans World Airlines, Inc.
Not Reported in F.Supp., 1997 WL 417814 (N.D.Ill.), 10 NDLR P 226

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.
