<u>CASE/CITATION AVAILABLE IN</u>
<u>WESTLAW ONLY</u>
NAUSEDA V. TOOTSIE ROLL
2003 WL 1873519



Not Reported in F.Supp.2d                                                                                                                                Page 1
Not Reported in F.Supp.2d, 2003 WL 1873519 (N.D.Ill.), 14 A.D. Cases 414, 25 NDLR P 303
**(Cite as: Not Reported in F.Supp.2d)**

CNauseda v. Tootsie Roll Industries, Inc.
N.D.Ill.,2003.

United States District Court,N.D. Illinois, Eastern Division.
Alex NAUSEDA, Plaintiff,
v.
TOOTSIE ROLL INDUSTRIES, INC., Defendant.
**No. 02 C 2150.**

April 15, 2003.

*MEMORANDUM OPINION AND ORDER*

ZAGEL, J.
***1** Plaintiff, Alex Nauseda, brings this claim under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12110*et seq.* Specifically, Mr. Nauseda alleges that defendant violated the ADA by (1) terminating his employment; (2) refusing to accommodate his alcoholism; and (3) subjecting him to daily breathalyzer tests prior to his discharge.

Mr. Nauseda was a Supervisor in defendant's Maintenance Department, and he worked from 3:00 p.m. to 11:30 p.m. on a daily basis. Amongst his various job duties were working with heavy machinery and making sure that he and his crew of fourteen avoided injury while working with heavy machinery. Each December, defendant's Chicago plant (where Mr. Nauseda worked) ceases all production activity to allow maintenance employees to overhaul, repair and redesign the machinery and equipment in the plant. Although there is dispute as to whether this period of time is the busiest of the year, there is no dispute that this is a very critical time for the plant. From December 17, 2000, through December 20, 2000, Mr. Nauseda, without giving notice to defendant, checked himself into a hospital to undergo in-patient treatment for alcohol dependency. This period of time coincided with the annual shutdown period, and Mr. Nauseda was scheduled to work from December 18 through the 20th. While he was in the hospital, Mr. Nauseda asked his daughter to call his supervisor, Greg Kurtz, and let him know that he was in the hospital being treated for alcohol dependency. Upon learning of this, Plant Manager Stephen Green asked Director of Engineering Jim Smentek to visit Mr. Nauseda in the hospital and assure him that his job was secure during his treatment period and that he could take as much time as needed for treatment, which Mr. Smentek did.

On December 27, 2000, Mr. Nauseda met with Mr. Kurtz and Mr. Green, during which time Mr. Nauseda admitted having a problem with alcohol dependency, indicated that he had enrolled in an Alcoholics Anonymous ("AA") program, and declared his commitment to never drinking again. Mr. Green assured Mr. Nauseda that defendant was committed to Mr. Nauseda's success as a Supervisor and emphasized the importance of refraining from the consumption of alcohol while at work because not only would that be in direct violation of company policy, Mr. Nauseda was a Supervisor and representative of defendant. Mr. Nauseda himself added that there was a safety issue as well. At this time, Mr. Green also told Mr. Nauseda that defendant would try to accommodate him should he be asked to support someone else in the AA program during that person's time of need, and Mr. Green also advised Mr. Nauseda that there would be no further warnings and that Mr. Nauseda must remain alcohol-free from that point forward. Mr. Green informed Mr. Nauseda that he would have to submit to a breathalyzer test before beginning work each day to make sure he was alcohol free, and Mr. Green also taught Mr. Nauseda how to work the machine and told him how the results would be tracked and recorded. On January 2, 2001, Mr. Nauseda returned to work and took the breathalyzer test every day before his shift began. Throughout the remainder of his employment, defendant never restricted his job duties or responsibilities or cut back his hours.

***2** Between approximately 12:30 a.m. and 7:00 a.m. on February 28, 2001, Mr. Nauseda drank what he estimates to be a half gallon of wine (although he cannot remember with certainty how much he drank). He reported to work at approximately 2:30 p.m. that day, took his daily breathalyzer test, and registered a 0.028 blood alcohol level. He then immediately retook the test and registered a 0.027 blood alcohol level. Defendant's nurse, Rose Good, was present

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 1873519 (N.D.Ill.), 14 A.D. Cases 414, 25 NDLR P 303
**(Cite as: Not Reported in F.Supp.2d)**

Page 2

when Mr. Nauseda took these tests, and to explain the results, Mr. Nauseda told Ms. Good that he drank "a couple of glasses with wine at dinner" the night before. Ms. Good informed Bill Rauch, defendant's Human Resources Manager for the Chicago plant, about the test result. Mr. Rauch paged Mr. Green, and when Mr. Green arrived, Mr. Nauseda told Mr. Green that he had "two glasses of wine" the previous night with dinner. At this time, Mr. Green sent Mr. Nauseda home and told him to report back on March 2, 2001. Before that date, Mr. Green consulted Michael Hale, Director of Human Resources, and they agreed that Mr. Nauseda's employment should be terminated. Mr. Hale reviewed an Internet website describing alcohol metabolization rates, which confirmed his and Mr. Green's suspicion that Mr. Nauseda had not been truthful about how much he drank the night before. On March 2, 2001, Mr. Green met with Mr. Nauseda and informed Mr. Nauseda that he felt that Mr. Nauseda had not been entirely truthful with him, explained why he did not believe that Mr. Nauseda had only two glasses of wine the night before, and informed Mr. Nauseda that he was terminated. Mr. Green told Mr. Nauseda the reasons for his termination: (1) Mr. Nauseda had reported to work under the influence of alcohol after being warned that such conduct would not be tolerated; (2) Mr. Green felt he could no longer trust Mr. Nauseda as a Supervisor; (3) Mr. Nauseda had shown poor judgment in showing up for work under the influence of alcohol; and (4) Mr. Nauseda had lied about how much he drank.

Mr. Nauseda does not dispute the above facts. Rather, he argues that not only was it wrong of defendant to subject him to daily breathalyzer tests, doing so was merely laying the groundwork for firing him for being an alcoholic. Mr. Nauseda also argues that his work performance had always been good; that defendant had never suspected him of being an alcoholic prior to Mr. Nauseda being upfront with defendant; and that other managerial and supervisory employees had come to work after drinking alcohol and never been subjected to breathalyzer tests or discharged.

An individual is disabled if he has (1) "a physical or mental impairment that substantially limits one or more of [his] major life activities"; (2) "a record of such impairment"; or (3) is "regarded has having such an impairment." 42 U.S.C. § 12102(2). While defendant does not deny that alcoholism is an impairment, defendant argues that in Mr. Nauseda's case, that impairment does not substantially limit one or more of his major life activities. Mr. Nauseda counters with two assertions: first, that while in the hospital, all of his major life activities were disrupted, and second, that his alcoholism "affects every phase of his life: sleep, the ability to communicate with others, etc, etc." Mr. Nauseda also contends that defendant perceived Mr. Nauseda to be disabled.

**\*3** With respect to Mr. Nauseda's arguments regarding his alleged substantial limitation on his major life activities, the hospital stay only lasted a few days, and even if there is potential for Mr. Nauseda to be in the hospital again for alcohol treatment, these "disruptions," as Mr. Nauseda calls them, do not constitute a substantial limitation. *See Van Zande v. State of Wisconsin Dep't of Admin., 44 F.3d 538, 543* (7th Cir.1995) ("Intermittent, episodic impairments are not disabilities."). The effect of Mr. Nauseda's alcoholism on major life activities such as sleeping and communicating, even if accepted as true in the absence of evidence other than Mr. Nauseda's allegations, is described by Mr. Nauseda himself to "affect" those major life activities. To "affect" major life activities does not rise to the level of substantially limiting them. Indeed, if the standard set forth by the ADA for a disability were merely that the impairment affect a major life activity from time to time, the number of impairments covered by the ADA would be infinite.

With respect to Mr. Nauseda's contention that defendant perceived him to be disabled, this part of the ADA is meant to cover those situations in which an employer *mistakenly* believes that an employee has an impairment which substantially limits a major life activity when, in fact, the employee either does not have an impairment or does not have a substantially limiting impairment. *See Sutton v. United Air Lines, Inc., 527 U.S. 471, 489, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999)*. This is generally difficult for a plaintiff to prove. *Id. at 494.* Nevertheless, it is clearly Mr. Nauseda's position that he *is* disabled, and thus, this argument does not make sense. None of the arguments set forth by Mr. Nauseda show that he is disabled under the ADA.

Even if Mr. Nauseda was disabled, his claim of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                     Page 3
Not Reported in F.Supp.2d, 2003 WL 1873519 (N.D.Ill.), 14 A.D. Cases 414, 25 NDLR P 303
**(Cite as: Not Reported in F.Supp.2d)**

discriminatory discharge still fails. To establish a claim of discriminatory discharge under the ADA, Mr. Nauseda must show that (1) he is disabled; (2) he is qualified for his position; and (3) he suffered an adverse employment action because of his disability. See Bekker v. Humana Health Plan, Inc., 229 F.3d 662, 669-70 (7 th Cir.2000). Assuming that Mr. Nauseda meets the first two elements for the moment, he cannot meet the third.

The ADA clearly states that an employer:
may require that employees shall not be under the influence of alcohol ... at the workplace ... [and] may hold an employee ... who is an alcoholic to the same qualification standards for employment or job performance and behavior [that it] holds [to] other employees, even if any unsatisfactory performance or behavior is related to the ... alcoholism of such employee.

42 U.S.C. §§ 12114(c)(2) and (4). Defendant's company policy strictly forbids employees from reporting to work under the influence of alcohol, and Mr. Nauseda was informed that he would be expected to abide by that policy with no exceptions. He violated the policy, and was thus terminated, not only for the violation, but also for lying to his superiors. Although Mr. Nauseda alleges that other managerial and supervisory employees have gotten away with coming to work after drinking alcohol, the only incident that Mr. Nauseda was a party to was a lunch with some employees who allegedly had a few drinks and went back to work. The only evidence of this incident that Mr. Nauseda offers is his own testimony, and even if this were sufficient, the individuals who were responsible for the decision to terminate Mr. Nauseda have testified that they knew nothing of this incident, nor of any other incidents in which an employee came to work after drinking alcohol. Mr. Nauseda has not presented a single piece of evidence to refute testimony that those involved with his termination knew of other employees coming to work with alcohol in their systems other than his own speculation.

**\*4** With respect to the breathalyzer testing, the Seventh Circuit has indicated that such a measure is actually a rather generous accommodation, not wrongdoing by the employer. In *Bekker,* the plaintiff asked her employer, who suspected that she had a drinking problem after receiving reports that she smelled of alcohol on the job, to give her a daily breathalyzer test rather than fire her. 229 F.3d at 665. She claimed that the tests would prove that she was in fact not under the influence of alcohol during work. *Id.* The employer refused the request and terminated her, and the Seventh Circuit upheld that decision, noting that the requested accommodation was not reasonable.*Id.* at 668.Defendant, upon learning of Mr. Nauseda's alcoholism, clearly did not want to fire him, as evidenced in the hospital visit and meeting with Mr. Nauseda before he returned to work in January of 2001. Thus, Mr. Nauseda's argument that defendant deliberately made Mr. Nauseda take breathalyzer tests for the sole purpose of being able to fire him is not compelling. It was reasonable for defendant to want some assurance that Mr. Nauseda was reporting to work sober, especially considering that he and the employees he supervised worked with heavy machinery. Not only was Mr. Nauseda responsible for his own safety, he was responsible for those employees' well-being also. Should an employee under Mr. Nauseda's supervision be hurt on the job due to negligence or incompetence on Mr. Nauseda's part because Mr. Nauseda had been drinking alcohol, defendant, having known that Mr. Nauseda was an alcoholic, could be liable for such injury if it did not take reasonable measures to ensure Mr. Nauseda's sobriety on the job. To request that defendant allow itself to be vulnerable in this way is an extremely unreasonable accommodation for Mr. Nauseda to request. Alcoholism is very difficult to overcome, and while Mr. Nauseda was upfront with defendant and expressed an earnest desire to stop drinking, it was not unreasonable for defendant to need some additional assurance that Mr. Nauseda was truly reporting to work alcohol free. Generally, one does not undergo treatment for alcoholism and become immediately cured, which is clear from Mr. Nauseda's own long history of treatment.

Defendant attempted to accommodate Mr. Nauseda's alcoholism and informed him from the start that it would not tolerate his being under the influence at work. Not only did Mr. Nauseda break his promise to defendant and violate the policy, he betrayed defendant's trust by lying about how much he drank. Defendant's reasons for terminating Mr. Nauseda were reasonable and not due to any discriminatory intent.

For these reasons, I grant defendant's motion for

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d Page 4
Not Reported in F.Supp.2d, 2003 WL 1873519 (N.D.Ill.), 14 A.D. Cases 414, 25 NDLR P 303
**(Cite as: Not Reported in F.Supp.2d)**

summary judgment. Mr. Nauseda, in his response to defendant's motion, included a cross-motion for summary judgment, which is denied.

N.D.Ill.,2003.
Nauseda v. Tootsie Roll Industries, Inc.
Not Reported in F.Supp.2d, 2003 WL 1873519 (N.D.Ill.), 14 A.D. Cases 414, 25 NDLR P 303

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.